# SUPREME COURT

#### OF THE

## STATE OF MISSOURI,

### MARCH TERM, 1852, AT ST. LOUIS.

#### [CONTINUED FROM VOL. XV.]

~~~~~~~~~~~~~~~~~

FRYE, *et al.*, Appellants, *vs.* KIMBALL, Respondent.*

The third and fifteenth sections of the act of the Missouri Legislature, concerning executors and administrators, approved February 21st, 1825, have no retrospective operation, and do not, of themselves, without some action of the court, have the effect to revoke the letters of an administratrix, who had married before the passage of the act.

### *Appeal from St. Louis Circuit Court.*

THIS was ejectment, in the St. Louis Circuit Court, against Kimball, tenant of the Lindells, for a piece of ground lying in the city of St. Louis. It was tried at the November term, 1847, and there was a verdict and judgment in favor of the defendant.

On the 10th of August, 1824, letters of administration were issued by Silas Bent, clerk of the St. Louis County

---

*This case was determined at the March term, 1850, and should have been published in Vol. xiii of the Missouri Reports.

1—VOL. XVI.

Court, to Elizabeth Hinderlong, on the estate of Jacob Frye, *alias* Hinderlong, late of said county, which were duly recorded on the same day, she having given bond, with J. Spalding and Frederick Dent as securities, in due form, in the sum of $5000, for the faithful administration of the said estate.

On the 29th of December, 1824, appraisers were sworn, and made an inventory and appraisement of the property of Jacob Hinderlong, *alias* Jacob Frye, which were filed on the 24th of March, 1826. The appraisement amounted to $778 25. Previous to March 24th, 1826, sale was made of the inventoried articles, amounting to $507 50½. After the letters were issued, and somewhere about January 1st, 1825, said Elizabeth Hinderlong intermarried with one John Vogle.

On the 24th of March, 1826, a settlement was made with the Probate Court, under the style of John Vogle and Elizabeth, his wife, administrator and administratrix of Jacob Hinderlong, *alias* Jacob Frye, deceased, when the court ascertained that the administrators had received, on account of the estate, $716 12¾, and had expended $843 58⅓, leaving a balance against the estate of $127 45½.

On the 26th of September, 1826, John Vogle and his wife Elizabeth, administrators of Jacob Frye, *alias* Hinderlong, made another settlement, wherein the entry is, that they have received, since the last settlement, $56 30¾, and have disbursed since the last settlement, and including the balance thereof, $207 46½, leaving a balance in favor of said administrators, against said estate, of $152 15¾; and on the 16th of August, 1828, the court discharged them from any process, unless on application of some one interested.

On the 25th of March, 1826, a petition, which was sworn to, was presented to the Probate Court, by John Vogle and Elizabeth, his wife, administrator and administratrix of Jacob Hinderlong, *alias* Jacob Frye, for an order for the sale of so much real estate as would pay and satisfy the remaining debts, alleging that the assets that had come to their hands, amounted to the sum of $716 12½, and that the debts proved and allowed

against the estate, by the Court of Probate, amounted, as per schedule, to the sum of $1847 30, and that there was no personal property remaining, nor any debts available. A list of the debts allowed and of the real estate accompanied the petition, consisting of two pieces only, one of which was half of the brick house, and the other was the land in question, consisting of about five arpens, then lying just west of the city of St. Louis. An order of publication was made, returnable to the third Monday of June. At the June term, 1826, an order, reciting publication proved, &c., and that there were no moneys or personal effects for the payment of debts, was made for the sale of the half of a brick house, one of the pieces of property belonging to Frye, at the time of his death.

At the September term, 1826, on the 26th of the month, the report of the sale of the half of the brick house was continued.

On the 6th of October, 1826, John Vogle and wife, administrators, &c., report the sale of the half of said brick house to Frederick Dent, for $700, which was confirmed.

Afterwards, at the December term, 1826, to-wit, on the 4th of January, 1827, said John Vogle and wife, administrators as aforesaid, filed their petition, sworn to, setting forth that the sale of the half of the brick house did not bring enough, with the personal effects, to pay the debts of the deceased, and praying for an order for the sale of the other piece of real estate, to-wit, a house and six arpens of land in the vicinity of St. Louis, being the same that Jacob Frye died possessed of, and part of the land owned by Jeremiah Conner. Thereupon, an order is made by the court, for publication of notice to all interested in said application, and that it will be granted, unless cause can be shown to the contrary, at the next term, &c., and a sale be ordered of said land, describing it as above.

On the 19th of March, 1827, the court take up the petition, and state that the publication of the notice has been made according to law, and that there are no assets or personal effects to pay the debts, and thereupon, order the said administrator

and administratrix, on the first Monday of May then next, at the court house door, in the city of St. Louis, to proceed to sell, at public auction, for cash, during the sitting of the Circuit or Probate Court, the said land described as above, first having the same appraised, and notice published four weeks in a newspaper, and advertisements put up in ten public places, twenty days before sale.

On the 8th of May, 1827, the said John and Elizabeth, administrator and administratrix of Jacob Frye, *alias* Hinderlong, deceased, file their report, which the County Court then approve, the jurisdiction of the Court of Probate having, in the mean time, been transferred to the County Court; which report set forth that the house and lot mentioned in the order of sale were exposed to sale, to the highest bidder, during the sitting of the Circuit Court, on the first Monday, being the seventh day of May, the sale having been duly advertised, according to the direction of the order, and the appraisement having been made ; and that Jesse Lindell was the highest bidder for the same, at the sum of $1040, and that they are ready to make a deed as soon as the report should be approved. The appraisement is returned with the report, as having been made on the fifth day of May, 1827, at $1000, together with the affidavit of the appraisers.

The record does not state that this report was verified by affidavit.

Immediately after the approval of the said report, the deed was made by John Vogle and Elizabeth, his wife, dated May 8th, 1827, to Jesse G. Lindell and Peter Lindell, which deed recited the order of sale, appraisement, advertisement of sale, sale to the Lindells, and report and ratification thereof, and purported to convey all the right and estate of Jacob Frye, *alias* Hinderlong, at the time of his death.

This deed was acknowledged by John Vogle and wife, as administrator and administratrix of Jacob Frye, *alias* Hinderlong, deceased, in the County Court of St. Louis county, on the ninth of May, 1827, and was recorded on the twenty-

second day of the same month ; but the certificate of acknowledgment does not state that they were personally known, &c.

On the 15th of February, 1828, under the title of " John Vogle, administrator, and Elizabeth Vogle, administratrix of Frye, *alias* Hinderlong, report of sale," is the following entry, viz :

" It is ordered by the court that the entry made in book B, page 312, of November 8th, 1827, of the minutes of the court, be expunged, and the following entry made in lieu thereof," and then follows an order, purporting to confirm the same report and make it valid forever, which order is a long and formal entry.

It appeared that Jacob Frye, *alias* Hinderlong, owned the property and lived on it, at the time of his death ; that the plaintiffs are his children, and were under age, at the time of his death.

The plaintiffs asked an instruction, that if Jacob Frye was seized at his death and the plaintiffs were his heirs at law, they were entitled to recover, which was refused. One was given for the defendant, to the effect that the record from the Court of Probate and the deed to the Lindells were sufficient to pass the title.

The sole question is, whether the administration sale and the deed to the Lindells was void.

*F. M. Haight, Leslie & Lord,* for plaintiffs in error.

The third and fifteenth sections of the act of 1825, concerning executors and administrators, expressly prohibit a married woman from acting as executrix or administratrix, after the law should take effect. The administration sale was, therefore, void.

The legislature had power to pass this act. Its power to suspend an administration, to change, alter or modify laws for the distribution or settlement of the estates of decedents, cannot be questioned.

This law was not *ex post facto,* because it does not apply to criminal proceedings.

It is not retrospective, because it does not affect the validity of past transactions.

It does not impair the obligation of contracts, because there is no contract to be impaired. 22 Pick. 430 ; 6 Pick. 501.

The meaning of the term " contract," as used in the Constitution of the United States, is well defined in the case of *Dartmouth College* v. *Woodward*, 1 N. H. 111.

John and Elizabeth Vogle, being prohibited by law from acting in the administration of this estate, could not, with the aid of any decree or order of a Probate Court, confer a valid title. 6 Wheat. 119. 7 Wend. 148.

That the sale took place under the sanction of a court, will not prevent its validity from being inquired into, *collaterally*, in this suit. There is a distinction to be observed between the erroneous decree of a court which has jurisdiction, and the decree of a court which has no jurisdiction. 1 Peters, 340. 3 Howard, 762. 9 Cow. 227. 19 J. R. 39. 1 Hill, 130. 3 Howard, 762.

The ground of the jurisdiction of an inferior tribunal, must appear on the face of the proceedings. *Walker* v. *Turner*, 9 Wheat. 541.

As to jurisdiction of Probate Courts, see 14 Mass. 222. 4 N. H. 65. 1 Hill, 130. 2 Vermont, *Washburn's Dig.* 647. 1 Howard, (Miss.) 439. 6 ib. 114, 234. 9 S. & M. 505. 3 J. J. Marsh. 105. 10 Peters, 161. 6 Iredell's Rep. 27. 3 Stewart & Porter, 355. 5 Monroe, 42. 8 Cranch, 9. 4 Day, 137. 12 Mass. 503. *Barber* v. *Bush*, 7 Mass. 510.

On the application for the second order, under which the sale was made, there was no account or statement of the then condition of the estate. 1 Hill, 130. 12 Serg. & Raw. 171.

No affidavit was annexed or filed with the report of sale, and the report did not contain the requisite pointed out by statute. No copy of the advertisement accompanied the report.

More land was sold than sufficient to pay the debts, and the sale was, therefore, void. 15 Pick. 23. 4 N. H. 166.

Frye, et al., *v.* Kimball.

No guardians were appointed for the plaintiffs, who were minors.

The deed was not duly acknowledged, as required by the statute.

The appointment is not set out in the deed.

*J. E. Munford*, for same, cites 4 Mass. R. 354. 7 Mo. 374. 4 Humph. 79. Williams on Executors, vol. 1, p. 266. Roper on Husband and Wife. 30 Law Lib. side page 188. Toller on Executors, 6th Lond. ed., p. 91. 11 Serg. & Raw. 441. 17 Serg. & Raw. 392. *Bartlett* v. *King*, 12 Mass. 563. 2 Peters, 492. 1 Hill, 139. 20 Wend. 245. 15 Do. 449. 5 Dana, 585. 5 Humph. 96. 4 Yerger, 218. 6 Do. 522. 10 Do. 237. 7 Mo. 426. 6 Cow. 224. 12 Mo. 63. 12 Ohio, 271. 6 Smed. & Mar. 259. 7 Do. 449. 7 Shep. 400. 15 Pick. 31. 4 N. H. 167. 8 Met. 363. 20 Wend. 241. 1 App. 150.

*J. Spalding*, for defendant in error.

I. The marriage of Elizabeth Hinderlong was after the grant of letters to her, and before the act on administration, contained in Rev. Code of 1825, took effect. Her letters were not revoked by the third and fifteenth sections of that act, nor by the marriage. 1 Williams on Executors, 267. 2 Do. 632, 633. Com. Dig. Administrator, D. 1 vol. 469, 487. That at common law, married women could administer, cites Roper on Husband and Wife, 187, (30 Law Lib. 119, 120.) 7 Mass. 510, directly on the point.

At any rate, the act on "laws," Rev. Code of 1825, p. 500, sec. 13, preserved the letters and authority, even if the case were embraced in the words of the administration act.

The constitution forbids the construction contended for, as it would make the act retrospective and operative to avoid vested rights.

That the letters continued in force, notwithstanding the marriage, in such cases, was the cotemporaneous construction of the act, and should be so held now. 15 Ohio, 703.

II. The sale is not invalid by reason of the nonproduction of

an account and list, &c., filed with the petition on which the order of sale was made, nor for any other alleged irregularities before the deed, such as want of affidavit, &c. 10 Peters' Rep. 473. 2 Howard, 319. 2 Peters, 157. 11 Serg. & Raw. 422, 425–6, &c., 429, 431. 11 Mass. Rep. 227, (refers to and is supported by 7 Mass. 292.) 5 Ham. (Ohio,) 294–500. 3 Ohio Rep. 272–553. 4 Dana, 429. 2 Vermont, 253. Rev. Code, 1825, p. 106, sec. 40, describes the mode of application, and says, that on filing the petition and the account of his administration, the order shall be made, &c. Page 110, section 46, shows that it is not necessary to go over the whole matter *de novo,* where the first sale does not raise the money.

The first petition was accompanied with a list of lands and of demands allowed ; and alleges that there was no personalty, incorporating, by reference, the settlement with the court that had been made the day .before, (24th March, 1826,) and is sworn to ; and the sale having been made of same property, and not bringing enough, the second order was merely a continuation of the proceeding, and needed no new petition, though one in fact was presented, and a new notice given, &c., before the order to sell the property in question was made. See Code of 1825, p. 110. 2 Vermont, 253, *Langdon* v. *Strong, et al.* The court decide, among other things, that an administration sale was not void, because the appraisal was made after the date of the deed, though the law requires it to be made before. 2 Green's Chy. Rep. 147, 156, 165. 1 Wash. Rep. 317, *Administrators of Tryon* v. *Tryon,* that the Probate Court, though of a limited jurisdiction, is entitled to same presumptions in its favor as other courts. 6 Porter, 219, *Wyman, et al.,* v. *Campbell,* to same effect. 6 Porter, 262. 15 Ohio Rep. 689. This was a case where the same doctrine was laid down as in 2d of Howard's Rep., viz : that sale by administrator is a proceeding *in rem,* that if there be jurisdiction, the title passes, &c.

On filing the sworn petition, with the list of lands and of

debts and account of administration incorporated by reference, jurisdiction attached.

3 New Jersey Rep. 73, as to what confers jurisdiction, and that Probate Court is not of limited jurisdiction in such sense as a justice of the peace, &c.

III. The deed is not invalid because Peter Lindell is a grantee in it.

Shep. Touch. 234–5. If a grant be to A & B, if A cannot take, the whole goes to B.

7 Ham. (Ohio) Rep. 340, *Ewing* v. *Higby*. An administrator may convey to the assignee of the purchaser. 1 Dana, 212. 5 Miss. Rep. 314. The same as to sheriffs' deeds.

IV. The sale and deed are valid, even if the administration act of 1825 did operate upon the letters granted to Elizabeth Vogle, while *sole*. The administration had regularly begun ; she and Vogle, after the marriage, were continually recognized by the Probate Court, on its records, as having full powers as administrators, no revocation having been made.

The act of 1825 contemplated a revocation of letters, in case of marriage, before the letters should be a nullity, as to third persons. The general doctrine, as to officers *de facto*, is applicable. Suppose the marriage had been secret, and kept secret for years, would the letters, and all acts under them, be held void, as soon as the marriage could be proved ?

V. The order to sell was the judgment of a court of general jurisdiction, in a case within its jurisdiction ; and the confirmation was likewise the judgment of the same court, upon the act of sale, after it was done ; both of which judgments presuppose every thing done requisite to their validity, and are entirely conclusive, if the jurisdiction had attached. That it had attached is plain. 2 Howard, 319. 15 Ohio, 689. 4 Dana, 429.

VI. The application of the rigorous doctrine contended for, to administration sales, made twenty years ago, and upwards, is improper and unwise, and would overthrow nearly all such

sales. This consideration justly influences the action of all courts, and should have great weight here as to early sales. 2 Howard, 319. 5 Ham. 294–500. 15 Ohio Rep. 703.

The decisions of sister States, avoiding such sales, for technical irregularities, should have no weight with us. Such sales depend on the peculiar statutes, and the peculiar practice and modes of proceeding, and general policy and spirit of legislation of each State.

VII. The *deed is not inoperative* for the reason that the certificate does not state *that the parties were known to the court,* because this suit is between *original parties* to the deed, or rather, between original grantees and heirs of the grantor.

Rev. Code, 1825, p. 221, sec. 14, shows the intent of the act to be, to protect " *subsequent purchasers and mortgagees.*" The plaintiffs here are heirs.

*Gamble & Bates,* for same.

The marriage of Mrs. Fry or Hinderlong, did not have the effect to revoke her letters.

At common law, the marriage of a *femme sole* did not avoid her administration. 1 Williams on Executors, 267. 2 ib. 632, 633.

The act of 1825 was prospective, operating only on administrations where the *femme sole* administratrix should marry after it took effect. Such is the meaning of the language employed in sections 3 and 15.

The administrator acquires a vested interest in the goods of the intestate, which is property recognized in every tribunal, and this interest can no more be divested, without default and without trial, than can the full property of any owner. Here, the marriage of the administratrix was prior to the taking effect of the act of 1825. 1 Williams on Ex'rs, 411. *Overfield* v. *Bullett,* 1 Mo. Rep. 749. Constitution of Mo. Art. 13, sec. 17.

Even if the administration had been annulled by the statute, this would not have the effect to invalidate the sale.

It is said, that the Probate Court is a mere statutory court, and that its proceedings are only to be sustained, upon proof that all the requirements of the law have been complied with. To this, it may be replied, that such court, although not established by the constitution, is provided for by that instrument. See Art. 5, sec. 12. It is established, in pursuance of the command of the constitution, as a court of record, exclusive within its sphere, and with all the powers that are requisite to the exercise of its important jurisdiction. See Code of 1825, p. 270, secs. 6, 16, 17, &c.

It had exclusive jurisdiction, in all cases relating to the "right of administration," "the granting of letters, and repealing the same." It had exclusive jurisdiction over the subject of selling lands of intestates, for the payment of their debts. All its original jurisdiction was exercised, subject to the right of the party to appeal to the Circuit Court.

The proceeding was a proceeding *in rem*, to which all the world are parties, and not a proceeding between parties litigant, and the court having acted upon the petition, and made the order for the sale, that order was the judgment of a court of competent power, upon a subject within its jurisdiction, and its proceeding cannot be collaterally questioned. 10 Peters, 473. 2 Howard, 319. 2 Peters, 157. 11 Serg. & Raw. 425–29–31. 11 Mass. 227. 5 Hammond, 500. 3 Ohio, 553. 4 Dana, 429. 2 Verm. 253. 6 Porter, (Ala.) 219, 262. 3 N. J. Rep. 73. 15 Ohio, 703.

RYLAND, Judge, delivered the opinion of the court.

From the preceding statement, it will be seen that in this cause, the main question depends upon the construction of the act concerning executors and administrators, passed by the legislature of Missouri, and approved February 21st, 1825, which was to take effect from and after the fourth day of July, 1825.

The third section of this act declares, "that no person shall act as executor or administrator, unless he be twenty-one years of age, and upwards, and of sound mind; nor shall

any married woman act as executrix or administratrix; nor shall the executor of an executor, in consequence thereof, be executor to the first executor."

The fifteenth section declares, "that where any *femme sole* executrix or administratrix shall marry, her husband shall not thereby acquire any interest in the effects of her testator or intestate, nor shall the administration thereof devolve on him; but the marriage shall operate as an extinguishment of her powers, and her letters shall be revoked and repealed."

Now, in this case, the administratrix was married before the passage of the law, and the law itself had no effect, until the fourth of July, 1825.

The thirteenth article of the State constitution, section 17, declares, that "no *ex post facto* law, no law impairing the obligation of contracts, or retrospective in its operation, shall be passed by the legislature."

Now, in order to make this "act concerning executors and administrators" operate upon the marriage of the administratrix, in this case, it must necessarily have a retrospective action, which, we have seen, is plainly forbidden.

By the plain and obvious terms of the act, its whole tenor and scope directly and distinctly point to future actions. The last clause of the act itself postpones the taking of effect, until several months shall elapse.

"No person shall act," &c., "where any *femme sole* executrix or administratrix shall marry," &c., all point to the future.

Now, although the marriage of a *femme sole* executrix, after taking out the letters, and before the passage of this law, might afford a sufficient reason for the action of the Probate Court, after the law went into effect, to take steps to revoke and annul the letters, yet, until such action was had by the Probate Court, and an order made revoking them, we consider that such executrix still continues to be *de jure* and *de facto* executrix. So, likewise, with an administratrix.

We have not the least doubt that the act of 1825 did not reach this administration in this point. It might have been a sufficient cause for the Probate Court to have taken action and revoked the letters of administration; but until such action was had, she was still the administratrix.

The Probate Court was a court of record, and had general and original jurisdiction over the subject of estates, wills, executors and administrators; and we are inclined to suffer its acts to have full weight. We will not disturb the title to real property, acquired under the sales made in pursuance of the orders of the court, and we will not look with a scrutinizing eye into the proceedings of such courts, to find defects, in order to set aside sales of real estates, ordered and sanctioned by such courts.

The second application was but a continuation of the first, for sale of real estate to pay debts, and the Court of Probate having granted an order for such sale, and afterwards approved the acts of the administratrix and her husband, in making and conducting such sale, we feel disposed to let the sale stand unshaken by us.

I am, therefore, for affirming the judgment.

NAPTON, Judge, concurred in the above.

BIRCH, Judge. After taking into view all the facts and circumstances of this case, it is deemed unnecessary to go further in reference to the main point in controversy, than to express the opinion, that the cotemporaneous construction which seems to have been given to the act of 1825, was at least sufficiently reasonable to demand for it, for all the purposes of this case, the recognition and confirmation of this court. That it was generally construed as not reaching the case of an administratrix, who had married before its passage, may be sufficiently inferred (in the absence of any thing to the contrary,) from the facts imported by the record before us, disclosing not merely the acts of the court, in recognition of her continued authority, but the apparent acquiescence of a number of creditors of the estate, and the consequent inferential concurrence

of the bar of that period.    These creditors, it is inferred from
the statement of one of the counsel for the appellants, either
received nothing from the sale of the land in question, or, if
they did, it was from the securities of the administratrix.    If
the former, and the sale had not been *then* regarded as valid,
it would seem that some one of them at least would have been
found to cotemporaneously dispute the validity of the continu-
ing administration, and by urging then, as now, the invalidity
of the sale, have sought the appointment of a new and proper
administrator, together with a resale of the property, and an
application of the proceeds to the payment of their demands.
If the latter, as the securities could only be liable, upon the
assumption that the administration was legally continued, the
implied acquiescence of one of the oldest and soundest law-
yers, who then adorned and yet adorns the bar of this court,
(and who was one of the sureties in the bond,) is but addi-
tional persuasive testimony that the construction of the court
was acquiesced in by the profession.    In any point of view,
therefore, which now occurs to us, the presumption is a fair
one, that the proceedings and sale in question were had and
made under such a permissible cotemporary construction of
the law, as reconciled the most enlightened minds and the most
adverse interests of that day — a generation or more ago ; so
that it may well be forborne, at this distance of time, and in
a case like the present, to discuss, as an *original* proposition,
a question, upon the cotemporaneous adjudication of which,
rights have been at least honestly and *fairly* acquired,
and the divestiture of which, in cases like the present, would
be an emphatic private wrong.    So far, therefore, as the *right*
of administration is involved, it will not be further here consid-
ered.

Resulting from the same considerations, a certain degree of
forbearance may also be extended to what might otherwise
challenge a more critical consideration, namely, the technical
ambiguities, inaccuracies and omissions evolved by the record
of the Probate and County Courts.    It has been but too well

suggested, that were the estates of the country, which have been honestly and openly derived under the sales of administrators, to be subjected to the formal and technical tests which are here urged by the counsel for the appellants, a harvest of litigation, ending in a sea of ruin and of wrong, would be the inevitable consequence. This court, except to palpably *help out* the ends of every day justice, will, perhaps, increase in the reluctance it has heretofore manifested, to insist upon greater precision and formality in the proceedings of the inferior tribunals, than was reasonably to be anticipated in and from the manner of their institution and organization — for such they deem to be the spirit and meaning of the duty, in that respect, devolved upon them.

The record in question sufficiently discloses at least the most prominent and important facts — namely, that it was necessary to sell the land (or a portion of it) in order to pay the debts of the deceased, and that being so sold, it brought a greater sum than that at which it had been regularly appraised. Whether, at that early day, and having reference to the condition of the little lot of land in question, it was most judicious to order it to be divided and sold in parcels, or to be sold altogether, as it was, was then, as it would now be, a question for the sound discretion of the County Court, which we perceive no sufficient evidence to doubt was properly enough exercised in the case before us. The lot seems to have had a house upon it, and for that reason, as well as for others, which may be readily imagined, it may have been deemed best for the estate to sell it altogether. At all events, no sufficient case is made upon the record, to justify this court, at this day, in annulling the sale upon that score.

As to the alleged invalidity of the deed, because of a defect in the certificate of acknowledgment, it is deemed sufficient to remark, that as this suit is substantially between original parties, and as the record discloses the fact that the land was sold by persons representing the ancestor of the one, and paid for by the other, those who would now stand upon the original

seisin of the first, should not be allowed, in order to make that paramount, to take advantage of an omission, which the law would rather ascribe to his administrators as a *fault* than to his heirs as a *merit.*

Similar reasoning might, perhaps, be deemed sufficient as to the apparent incongruity between the report and confirmation of the sale to one of the Lindells and the subsequent execution of the deed to both of them; but were it even otherwise, both reason and authority seem sufficiently conclusive, that such a deed is not, therefore, null, but that it should and will operate in favor of such of the grantees as it *ought* to have been made to, or such an one as *can* take under it; and as in this action, the recovery of the plaintiff is defeated by showing title in any other person, it would seem that in either point of view, the point in question was unavailable to the plaintiffs.

Upon the whole case, therefore, believing as we do, from the general and special considerations to which we have adverted, that the *jus possessionis* attaches to the defendant, instead of the plaintiffs, the judgment of the Circuit Court is affirmed.